**IN THE COURT OF APPEALS OF IOWA**

No. 16-1312
Filed December 2, 2016


IN RE THE MARRIAGE OF MARSHA ANN RODASKY
AND DANIEL GLENN RODASKY

Upon the Petition of
MARSHA ANN RODASKY, n/k/a MARSHA ANN MEYERS,
　　　Petitioner-Appellee,

And Concerning
DANIEL GLENN RODASKY,
　　　Respondent-Appellant.
_____


　　　Appeal from the Iowa District Court for Woodbury County, Patrick H. Tott,

Judge.


　　　The respondent appeals from the child custody and property division

provisions of the decree dissolving his marriage to the petitioner. **AFFIRMED.**


　　　Kendra M. Olson, Sioux City, for appellant.

　　　John S. Moeller of John S. Moeller, P.C., Sioux City, for appellee.


　　　Considered by Danilson, C.J., and Doyle and McDonald, JJ.

**DOYLE, Judge.**

In this appeal, we review the child-custody and property-distribution provisions of a decree dissolving a twenty-one-year marriage. After reviewing the record properly before us, we agree with the district court's determinations regarding child custody and division of the property. Accordingly, we affirm.

**I. Background Facts and Proceedings.**

Dan and Marsha Rodasky were married in 1994. They have two children: M.R.,[1] born in 1997, and E.R., born in 1999. The parties separated in October 2015, and two months later, Marsha filed a petition for dissolution of marriage.

A trial was held in May 2016. On July 1, the district court entered a decree dissolving the marriage, determining custody of E.R., and dividing the parties' property. Dan filed a notice of appeal on July 29. He challenges the grant of physical care to Marsha, as well as the trial court's valuation of the marital home and the division of the home's equity.

**II. Motion to Stay.**

After perfecting his appeal, Dan moved our supreme court to stay the custody provisions of the decree.[2] The supreme court denied the motion. Thereafter, Marsha initiated a contempt action, and a hearing was held in which the district court received evidence from both parties. At the close of that action, Dan asked the district court to state E.R. was not required to return to Marsha's care. The district noted both that it lacked the power to modify the custody

---

[1] Custody of M.R. is not an issue as M.R. has reached the age of majority.
[2] Iowa Rule of Appellate Procedure 6.604(1) provides, "Upon application in a pending appeal, the appellate court may, in its discretion, stay any district court order, judgment, decree, or portion thereof affecting the custody of a child and provide for the custody of the child during the pendency of the appeal."

provisions of the dissolution decree in a contempt proceeding and that the dissolution decree had been appealed, denying it jurisdiction to modify its terms.

On November 8, Dan filed with this court a renewed motion to stay enforcement of the custody provision of the dissolution decree pending ruling on his appeal, citing evidence that was received in the contempt action of events that occurred after entry of the dissolution decree. Iowa Rule of Appellate Procedure 6.801 states:

> Only the original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket and court calendar entries prepared by the clerk of the district court *in the case from which the appeal is taken* shall constitute the record on appeal.

(Emphasis added.) Here, the case from which the appeal was taken is the dissolution proceeding. Therefore, we may only consider the evidence that was before the district court in the dissolution proceeding prior to Dan's appeal. *See State ex rel. Turner v. Iowa Elec. Light & Power Co.*, 240 N.W.2d 912, 913 (Iowa 1976) ("We cannot in review consider matter occurring subsequent to the trial court ruling."); *State v. Lynch*, 200 N.W.2d 896, 897 (Iowa 1972) ("Our review on this direct appeal is confined to matters properly of record in the trial court prior to and at the time of judgment entry."); *In re Sarvey's Estate*, 219 N.W. 318, 321 (Iowa 1928) (stating it is "manifest" that matters occurring after entry of the order appealed from "are of no concern to us in the determination of [the] appeal"). The contempt action Marsha initiated is a separate case, and the evidence received in that proceeding—of events which occurred after the decree was entered—cannot be considered in our determination of the issues before us in this appeal. *See Rasmussen v. Yentes*, 522 N.W.2d 844, 846 (Iowa Ct. App.

1994) ("Facts not properly presented to the court during the course of trial and not made a part of the record presented to this court will not be considered by this court on review."); *In re Marriage of Keith*, 513 N.W.2d 769, 711 (Iowa Ct. App. 1994) ("We are limited to the record before us and any matters outside the record on appeal are disregarded."). Rather, any matters that occurred after the decree was entered are more appropriately raised in a modification action. *See In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983) (providing the custodial provisions of a dissolution decree may be modified when, following entry of a dissolution decree, the circumstances have changed so materially and substantially that modification of custody is in the child's best interests).

We deny Dan's renewed motion to stay the child custody provisions, and we consider the merits of the appeal solely on the record properly before us.

**II. Scope of Review.**

Our review is de novo. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). This means we review the entire record and adjudicate the issues anew. *See id.* We give weight to the trial court's findings of fact, particularly with regard to witness credibility, although they are not binding. *See id.*

**III. Child Custody.**

Dan first challenges the provision of the decree granting Marsha physical care of E.R. He argues granting him physical care of E.R. is in E.R.'s best interests.

The overriding consideration in determining physical care of a child is the child's best interest. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa

2007). In making this determination, the court is guided by the factors set forth in Iowa Code section 598.41(3) (2015), as well as those identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974). *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (stating the custodial factors in section 598.41(3) apply equally to physical care determinations). "[T]he courts must examine each case based on the unique facts and circumstances presented to arrive at the best decision." *Id.* at 700.

The record shows that both Dan and Marsha have been active in E.R.'s life and, until recently, both had a good relationship with E.R. Although Marsha and E.R. have had some conflict in recent years, it appears to be the normal conflict that occurs as children reach their teenage years and begin to assert their independence. Although E.R. did not fight with Dan, the district court noted this may be because Dan deferred to Marsha to be the primary disciplinarian during the marriage.

After the parties separated in October 2015, E.R. initially remained in Sioux City with Marsha. In December 2015, Marsha agreed to allow E.R. to move to Vermillion, South Dakota, where Dan lives with his girlfriend, Joanie. Due to conflict, Marsha and E.R. did not communicate for a time in January and February 2016. They began speaking again in March 2016, and in April 2016, E.R. returned to Sioux City to live with Marsha while continuing to attend school in Vermillion.

The events that resulted in E.R.'s frequent change of residence are of concern to this court. E.R. chose to return to live with Marsha after reading an angry Facebook post made by Joanie about "toxic teens" that E.R. believed was

about her. Although Joanie denies that E.R. was the subject of her ranting, it is clear that E.R. and Joanie were often at odds while E.R. lived in Vermillion. After returning to Sioux City, E.R. was in a car accident while allegedly drag racing with a friend, resulting in charges for reckless driving being filed against her. Both Dan and Joanie made Facebook posts showing damage to the car in order to shame E.R. for her conduct. As the district court noted,

> it is clear that Joanie and Daniel's disciplinary technique of publicly shaming [E.R.] has caused her much pain and anxiety. While the court does not disagree that shaming can sometimes be a powerful way of correcting negative behavior, public shaming for a teenager, especially a teenage girl, can be devastating for the child personally and can cause untold reaction from her peers.

In the comments of her Facebook post about E.R.'s car accident, Joanie made derogatory statements about Marsha and her parenting. It was not the first time she had done so, nor is it the first time she had done so where E.R. could witness it. As the district court found, there is "overwhelming evidence" that "Daniel and especially Joanie have been very negative about Marsha" in front of E.R. Dan's sister, Mary, testified that after the parties separated, both Dan and Joanie would talk in E.R.'s presence about "Marsha not being a good mother and that she had a drinking problem." On multiple occasions, Mary asked Dan not to talk about Marsha in front of E.R. Not only did the conduct continue; Joanie attacked Mary over her request. As a result, Mary's relationship with Dan—which was good prior to the parties' separation—has deteriorated and is now almost nonexistent.

We recognize that E.R. testified she preferred to live with Dan. Although not controlling, we do give some weight to the E.R.'s stated preference as to

which parent she wants to live with. *See* Iowa Code § 598.41(3)(f). In assessing a child's preference, we look at, among other things, the child's age and educational level, the strength of the child's preference, the child's relationship with family members, and the reasons the child gives for the preference. *In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258–59 (Iowa Ct. App. 1985). Here, when asked her reasons for wanting to live with her father, E.R. responded that she did not like the school she attended when she lived in Sioux City and that she "instantly clicked" with the school and her peer group when she transferred to a school in Vermillion. She also stated she did not have many friends in Sioux City and had a lot of friends in Vermillion, "and so I prefer to be in Vermillion because I get along better with my dad, and I do have a lot of friends in Vermillion." We believe E.R.'s preference is influenced more by her desire to live and attend school in Vermillion than by a desire to live with Dan.

Much of the trial testimony focused on Marsha's use of alcohol. Joanie, an addict in recovery who has obtained a certificate in addictions counseling, believes that Marsha is an alcoholic. Marsha admits that she drinks alcoholic beverages regularly, but denies alcoholism. Rather, she testified that concerns about her drinking surfaced only after Dan began a relationship with Joanie. The only evidence in the record regarding any alcohol abuse by Marsha comes from Dan, Joanie, and E.R. With regard to E.R., the district court noted that at least some of E.R.'s concerns about Marsha's alcohol use "may be due to information that Daniel and Joanie have provided her," rather than by E.R.'s own observation. Other witnesses, like Mary and one of Marsha's longtime coworkers, testified they had never seen any evidence of Marsha intoxicated,

hung over, or abusing alcohol. To whatever extent Marsha uses alcohol, the record does not reflect a professional evaluation that she is an alcoholic, nor has she incurred any criminal charges related to alcohol use, or present a high risk of danger to an older child such as E.R.

Of more concern to the district court and to this court is the evidence relating to Dan and Joanie's attitudes toward and comments about Marsha, and the negative effect they had on Marsha's relationship with E.R. The district court found their conduct was responsible for "at least some of the current animosity" E.R. has toward Marsha. Ultimately, Dan and Joanie's behavior toward Marsha tipped the scales in favor of granting Marsha physical care of E.R. *See* Iowa Code § 598.41(3)(e) (listing each parent's ability to support the other parent's relationship with the child as a factor to consider in determining custody). The court reasoned:

> While the court certainly understands [E.R.]'s desire to change schools . . . and believes it was the right decision for her to do so, the court has very significant concerns about [E.R.]'s long term emotional well-being if she is placed in the custody of Daniel at this time. There is no doubt that both Daniel and Joanie have been destructive influences on [E.R] regarding her relationship with Marsha. At the same time, Marsha has not behaved in the same manner towards Daniel. Marsha allowed [E.R.] to move to Vermillion to have a chance at a new school. She did not try to undermine [E.R.]'s relationship with Daniel while [E.R.] was there. On the other hand, [E.R.] was basically made to return home to Marsha in April after the disagreements between her and Joanie with Joanie describing it as a toxic situation. At the same time Daniel and Joanie were repeatedly disparaging Marsha in front of [E.R.] despite pleas by others for them not to do so. As stated above, Joanie now states that at this time she is going to be making the situation all about her. This is certainly not in [E.R.]'s best interest when the situation should be all about [E.R.] and what is in her best interests. Marsha has also indicated that if [E.R.] is placed in her custody she will not make [E.R.] return to [the school she

attended in Sioux City] and that the two of them will find another school for [E.R.] to attend.

While it is clear that Marsha's use of alcohol has had a negative impact on [E.R.], the court finds that this negative impact is dwarfed in comparison to the emotional and psychological abuse she has been exposed to in Daniel's care. As a result the Court concludes that the long-term best interests of [E.R.] requires that her physical custody be placed with Marsha subject to Daniel's reasonable rights of visitation.

We concur, and for the same reasons, we find it is in E.R.'s best interests to grant Marsha physical care.

### III. Property Division.

Dan also contests the property division provisions of the dissolution decree, arguing the result is inequitable. He focuses on the parties' only real property, a home purchased in Sioux City in 2002 for $104,000. In order to enable Marsha and Dan to obtain a mortgage on the home, Marsha's parents loaned the couple $7000 to pay off their debts before the purchase, though the loan was never repaid. Marsha also used $5000 inheritance money toward the purchase of the home.

Over the years, Dan performed the labor to maintain and improve the home. This included replacing the roof and siding, installing a deck, painting the home's interior, and installing new flooring and a new shower. Marsha paid the cost of the maintenance.

It is undisputed that at the time of dissolution, there were two mortgages on the home, totaling over $90,000. The parties disagreed as to the home's value, however. Daniel claimed a value of approximately $140,000. In doing so, he noted a home across the street had recently sold for $210,000, though he acknowledged that home is larger. Marsha claimed the home's value was

$109,000, which is the amount the couple listed on their March 2016 Chapter 7 bankruptcy schedules. Although both parties signed the bankruptcy petition, Dan claims Marsha arrived at the $109,000 figure listed and he only signed the petition after the fact.

Citing the lack of "hard evidence" as to the current value of the home, the district court averaged the values claimed by the parties, arriving at a figure of $124,500. The court then reduced this amount by $5000 to reflect the amount of inheritance money Marsha contributed toward its purchase, reaching a final value of $119,500 for the purposes of the property distribution. The court awarded the home to Marsha, who received property with a total net value of $27,710.44, while the total net value of the property awarded to Dan equaled $9802.72. The court then determined that, "in light of Daniel's inconsistent employment during the course of the parties' marriage and the family relying primarily upon Marsha and the generosity of her parents for stability at times, and that Daniel is leaving the marriage with no debt," it was equitable to deviate slightly from "a straight 50/50 division." The court ultimately awarded $20,773.44—or fifty-five percent— of the net assets to Marsha and $17,168.00—or forty-five percent—to Dan. To reach these figures, the court ordered Marsha to pay Dan a property settlement of $8000.00.

Iowa Code section 598.21(5) requires marital property be divided equitably in dissolution-of-marriage cases. *See In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). We must first determine which property is subject to division, and then, considering the factors set forth in section 598.21(5), we

must decide how to divide the property equitably.  *See In re Marriage of Fennelly*, 737 N.W.2d at 102.

Dan first argues the trial court undervalued the home, which he asserts should be valued at $140,000.  "Valuation is difficult and trial courts are given considerable leeway in resolving disputes as to valuations."  *In re Marriage of Shanks*, 805 N.W.2d 175, 177 (Iowa Ct. App. 2011).  We will disturb the trial court's ruling only if there has been a failure to do equity.  *See In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005).  "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *Hansen*, 733 N.W.2d at 703.  Given the scant amount of evidence regarding the home's value, the figure arrived at by the district court was within the range of permissible evidence.

Dan also argues it was inequitable for the court to both deduct $5000 from the home's value and to award him less equity overall.   Although the partners in a marriage are entitled to a just and equitable share of the property accumulated through their joint efforts, we do not require an equal division or percentage distribution.  *See In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009).   Rather, we decide what is fair and equitable in each particular circumstance.  *See id.*  Here, Marsha was awarded property with a net value that is $3605.44 greater than the net value of the property awarded to Dan.  We find the division of property set forth in the decree is equitable.

**AFFIRMED.**